UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ████████████ **Plaintiff** <br><br> v. <br><br> TISHMAN SPEYER PROPERTIES, L.P. <br> 45 Rockfeller Plaza <br> 7th Floor <br> New York, NY 10111 <br><br> and <br> CONGRESSIONAL SQUARE (OWNER), L.L.C. <br> 45 Rockefeller Plaza <br> 7th Floor <br> New York, NY 10111 <br><br> and <br> UNIVERSAL PROTECTION SERVICE, L.L.C. <br> 1551 N. Tustin Avenue, #650 <br> Santa Ana, CA 92705 <br><br> **Defendants** | Case: 1:22−cv−01682 <br> Assigned To : Leon, Richard J. <br> Assign. Date : 6/7/2022 <br> Description: Gen. Civil (E−DECK) |

## COMPLAINT

Plaintiff, ████████████████████ for this Complaint against

Defendants Tishman Speyer Properties, L.P. ("Tishman"), Congressional Square

(Owner), L.L.C., ("Congressional"), and Universal Protection Service, L.L.C.,

("Allied") by and through undersigned counsel, alleges as follows:

NATURE OF ACTION

1.      This is an action for damages and other relief from all Defendants'
negligent and intentional acts as they relate to housing owned, leased,
operated, and maintained at 949 First Street, NW, Washington, DC 20004
known as DC Crossing.

2.      Plaintiff's damages include physical and psychological injury,
emotional distress, inconvenience, and other expenses related to Defendants'
negligent and intentional acts.  Plaintiff is also asserting a right to punitive
damages.  Damages to be proved at trial are in excess of $75,000.

## JURISDICTION  AND  VENUE

3.      This Court has jurisdiction over the subject matter of this
Complaint pursuant to 28 U.S.C. §1332. Defendant Tishman Speyer, L.P. is a
foreign entity organized in the State of New York. Defendant Congressional Square Owner,
L.L.C. is a foreign entity organized in the State of Delaware. Defendant Universal
Protection Service, L.L.C. is a foreign entity organized in the State of Delaware.  Plaintiff
██████████████ is a resident of ████████

4.      Venue is proper in this Court since the events giving rise to
the Plaintiffs claims occurred in the District of Columbia.

## PARTIES

5.      Plaintiff ████████████████ is a United States Citizen and a
resident of ████████

6.      Defendant Tishman Speyer Properties, L.P. is a Foreign Limited
Partnership organized in the State of New York (DOS ID 1596307).

7.      Defendant Congressional Square (Owner), L.L.C., is a Foreign
Limited Liability Company organized in the State of Delaware.

8. Defendant Universal Protection Service, L.L.C., ("Allied" or "UP") is a Foreign Limited Liability Company organized in the State of Delaware.

## FACTS

9. DC Crossing is an apartment complex located in the Navel Yard of Washington DC.

10. According to the DC Crossing website, DC Crossing is owned and developed by Tishman.  https://crossingdc.com/team (last accessed on May 31, 2022).

11. According to the lease agreement, DC Crossing is owned by Congressional. *See* Exhibit A.

12. Tishman is registered in the District of Columbia as a foreign limited partnership.  Michael B. Benner is listed as the beneficial owner.

13. Congressional is registered in the District of Columbia as a foreign limited liability company.  Michael B. Benner is listed as the beneficial owner.

14. At all times relevant to this complaint, ███████████ resided at DC Crossing in unit █████.

15. DC Crossing boasts the creation of a way of life, with the following on its website

> To live artfully is to live intentionally. At CROSSING, we cultivate a setting where our residents can connect physically, emotionally and creatively to their unparalleled surroundings. Those who call CROSSING home understand that every step, every movement, every decision is part of an unfolding masterpiece. Even the little moments — taking your first sip of coffee in the morning, striking a match to light a favorite candle, slipping off your shoes as you watch

the sun go down — are brimming with meaning. When
joy and richness abound in life's simple pleasures,
there's a limitless supply of inspiration within.

https://crossingdc.com/life/our-story (last accessed on May 31, 2022).

16.     DC Crossing provided state of the art security to include keyless entry systems, security cameras, and security personnel employed by Allied.

17.     Defendants employed agents, employees, officers, staff, administrators, representatives, servants, and exercised jurisdiction and control over said agents, employees, officers, staff, administrators, representatives, and/or servants and said Defendants determined the qualifications or lack of qualifications of said agents, employees, officers, staff, administrators, representatives, and servants related.

18.     Defendants devised all policies, programs, and/or activities for the aforementioned agents, employees, staff, administrators, representatives, servants, invitees, and/or residents of the community, and said agents, employees, staff, administrators, representatives, servant, worked in a common effort for the economic benefit for the aforementioned Defendants.

19.     Based on information included in court documents, beginning as early as February 2020, ARIAN TAHERZADEH ("TAHERZADEH") and HAIDER ALI ("ALI"), were residents of DC Crossing.

20.     Based on information included in court documents, TAHERZADEH and ALI, represented to residents of DC Crossing and Defendants that they were members of a special investigations unit under the auspices of Homeland Security Investigations, United States Special Police Investigations Unit, and Department of Homeland Security, and that they each had been deputized as

special police with the city government of the District of Columbia.

21.    TAHERZADEH and ALI boldly displayed identification, badges, handguns, assault rifles, vehicles, and surveillance equipment used by federal law enforcement agencies.

22.    Many who encountered TAHERZADAH and ALI were too distracted by the shiny badges, the guns, and the stories of dangerous, but somehow cool, "missions" to question their authority or check their credentials.

23.    TAHERZADEH and ALI had possession of and access to several apartments in DC Crossing that were allegedly paid for by the Department of Homeland Security.  At least one of the apartments was offered to members of federal government agencies to use free of charge.

24.    TAHERZADEH and ALI represented that they could access, at any time, the cellular phones of the residents, that they had video surveillance set up in DC Crossings, that they could access DC Crossings security video surveillance, that they had access to master codes that would allow them to enter any apartment at any time, and that they had replaced the intercom systems in some apartments to allow them to surreptitiously eavesdrop.

25.    TAHERZADEH and ALI recruited residents of DC Crossing, subjecting them to hazing-like rituals and assigning them surveillance projects. The surveillance projects included attempts to solicit confidential national security information from residents employed in various intelligence and security details within the federal government.

26.    Based on information and belief, TAHERZADEH and ALI were not working alone. ███████████ as well as other residents, was working with

TAHERZADEH and ALI.

27.     Based on information and belief, TAHERZADEH and ALI assigned others to attempt to gain information from and recruit government employees.

28.     TAHERZADAH and ALI's actions, representations, demeanor, boldness, and disregard for privacy of this magnitude could only have happened if all Defendants knew of the activities.  And if Defendants didn't know, they were incompetent.

29.     All Defendants knew or should have known that TAHERZADAH and ALI, and their associates, had unfettered access to private apartments, password protected private Wi-Fi, and password protected electronic devices.

30.     All Defendants knew or should have known that TAHERZADAH and ALI, and their cohorts, did not have permission from the persons they were allegedly surveilling to access those private spaces and devices.

31.     All Defendants knew or should have known that TAHERZADAH and ALI kept multiple weapons, handguns, assault rifles, and other items that violated the terms of the lease.

32.     All Defendants knew or should have known that TAHERZADAH and ALI acted recklessly and dangerously.

33.     ████████████ relocated to DC from ████████████████ ████ ████████████████████ rented an apartment in DC Crossing and lived there together until approximately ████████████████.

34.     ████████████ was employed[1] by the ████████████████ ████████████████████████████. After matriculating

―――――――――――――――
[1] ████████████ is in the process of retiring from ████████

from West Point, █████████ joined the ███████████ and was trained in and commanded covert missions in support of threats to the United States.

35.    In the course of his employment, ███████████was often deployed either alone or in a very small unit.  Given the sensitive nature of his duties, his knowledge that he had little backup, and that he had access to intelligence that could place him in danger, ██████████ began protecting his identity by using rotating emails, using a virtual private network (VPN), and implementing other safety measures and protocols.

36.    In pursuit of the defense of America, ████████████ life could be the subject of a novel or a movie, but for the fact that ██████████ takes the oath of secrecy seriously and has never revealed the goals or the details of the missions with anyone who either wasn't there or who does not have security clearance and a need to know.

37.    ██████████was flabbergasted when he learned that TAHERZADAH and ALI were using ████████████name in connection with the supposed undercover work they were involved in.  ██████████ had never met TAHERZADAH or ALI and was certainly not acting as a source of information as had been alleged.

38.    ████████████ told TAHERZADAH and ALI to stop using his name in connection with their so-called missions.  ████████████further explained to TAHERZADAH that the way he and ALI were behaving was not in conformity with the positions they purported to hold.  TAHERZADAH and ALI's blatant disregard for confidentiality when sharing stories that sensationalized the life of an undercover agent was inappropriate and dangerous.

39.   During the ███████████  ████████████ began experiencing seizures and nightmares related to post traumatic stress.  In ██████████████ ████████████████████████████

40.   While dealing with the seizures and nightmares, ████████████ became aware of irregularities with his electronic devices, such as his cell phone, his personal email, and his VPN.  Based on ██████████████ work experience, he began taking additional precautions to secure these devices.

41.   ███████████████████████████████ asked management if he could move to a smaller apartment within DC Crossing and the request was granted.  On or about ██████████████  ████████████████took possession of apartment ███████.[2]

42.   The Lease was executed by ██████████████ and Jeff Chad, a representative of Congressional.[3]  *See* Exhibit A.

43.   ████████████████was the only resident on the ██████████████for a few days.  ████████████████ moved into the adjacent apartment shortly after. ████████████████and ███████████were the only two residents on the thirteenth floor for approximately two weeks.

44.   Almost immediately after ████████████moved in, ██████████████ began experiencing more significant irregularities with his electronic devices, to the degree that ██████████████was concerned about data breaches.

---

[2] The Lease was not signed until ████████████████████████████████████████
██████████████████

[3] The Lease and other information indicate that Congressional owns DC Crossing.  However, the website for DC Crossing indicates that Tishman is the owner and developer of DC Crossing. Additionally, both entities are registered with the District of Columbia with Michael B. Benner as the beneficial owner and the same mailing address in Rockefeller Plaza, New York, New York.

45.   Not so coincidentally, about this same time, ███████████ met ████████████ and ███████████████████████ told ██████████ that he had been recruited by TAHERZADAH and ALI. ████████████ warned each of the dangers of being involved with people who recklessly flaunted their identity, their power, and their guns. ██████ would later share that ALI entered ████████ private apartment without permission when ██████ was not there.  ALI advised ████████ to watch what he said as ALI and TAHERZADAH had replaced the intercom so they could monitor his activity. ███████████ encouraged ██████ to report this activity to his superiors.

46.   At times, ████████████ would have to leave his apartment to make a call as his cell phone would be unable to make a call while in his apartment.

47.   ██████████████ secure VPN sporadically failed.

48.   ███████████████ knew that he was the subject of surveillance.  This exacerbated his nightmares and post traumatic symptoms.  ████████████ anxiety and depression became unbearable.  ███████████████ reported the fact that he was being watched, but no one seemed to care.

49.   On █████████████ in a moment of desperation, ███████████ contemplated ending his life and proceeded to take a knife and begin slashing his thighs.

50.   On or about ███████████████ ██████████████ made an online complaint regarding the intentional interference with his electronic devices with the ███████████████ ███████████ did not name ██████████ as he did not know his name at the time.

51.    On or about ███████████   ██████████ had an in-person meeting at the ████████ with ██████████████████████ ████████████████████████████████████████.

52.    During the meeting with ██████████, ████████████shared that there was a rogue HSI unit working out of DC Crossings.  He shared pictures of the injuries to his legs and named TAHERZADAH and ALI as the rogue officers who may be behind the surveillance.  ██████████received a follow-up email on ████████████ that ██████████ was investigating the allegations.

53.    On or about ███████████   ██████████was jolted awake when his stereo suddenly began blaring heavy metal music.  After jumping from bed to unplug the stereo, ██████████ knocked on ██████████ door to ask if ████████ had connected to ████████████ electronics via Bluetooth. ████████ responded that he would check and closed the door. ██████████ returned to his apartment.

54.    On or about ███████████   ██████████ knocked on ███ ██████████ door to inquire about ████████████ location near a common wall. ██████████apologized for any bother and ████████left.

55.    On or about ███████████   ██████████ encountered ██████████ in a common area. ██████████ asked if ████████had been experiencing any irregularities with his electronic devices as the irregularities with ██████████ electronic devices had increased.

56.    On or about ██████████████ after reporting additional irregularities to his government employer, ██████████ left a note on

████████door indicating that the continued irregularities would trigger an investigation and that ███████ wanted to notify the investigating organization of ██████ name and employment information.  On the evening of ████████████ ██████████ contacted ███████ to make sure he had received the note Mr. ████████ had left on the door earlier in the day. ████████confirmed that he had received it but did not give his name or his employer.

57.    Late at night on ███████████ or early in the morning on ███████████ █████████ was startled awake when the District of Columbia Police Department banged on his door. Not knowing who was at the door, ████████ grabbed his phone in case he needed to make a call.  His cell phone was inoperable until the police left.

58.    ████████ was made aware that ███████ claimed that he felt threatened by the note even though the officers saw nothing threatening about the note, however, there was no report made and the officers did not take any notes.

59.    At 9 am on ███████████ █████████met with the manager of DC Crossing, Jordan Weiss. ████████told Mr. Weiss that he had been experiencing irregularities with electronics, that ██████████ had reported the irregularities to ████████ that he was being surveilled, and that DCPD had made a late night visit. ████████made it clear that he had not threatened ██████ and that no police report was made.

60.    On ███████████ ████████appeared in D.C. Superior Court, Domestic Violence Unit and requested an *ex parte* Anti-Stalking Order against



██████████████  ██████████complaint falsely accused ██████████ of

attempting to commit terrorism based on ██████████s appearance.  ██████████

stated that he was fearful of ██████████ because ██████████ worked for

the ██████████████  During the hearing, B██████ stated that he was also

afraid of ██████████ because ██████████had tried to commit suicide – a

fact ██████████ never shared with ██████████. An order requiring ██

██████████ to stay at least ten feet from the neighbor was issued.

61.   On or about ██████████  ██████████ was served[45] with a

Notice to Correct Lease Violation.  The letter accused ██████████ of

> [E]ngaging in behavior that is obnoxious and that
> disturbs and threatens the rights, comfort, safety and
> convenience of others in the apartment community in
> violation of Paragraph 17 of your Lease.  This behavior
> specifically includes, but is not limited to, verbal
> harassment of other tenants of the apartment
> community in the form of interrogations and threats,
> including but not limited to, posting notices on the
> doors of other tenants of the apartment community.

62.   It seems strange, if not ironic, that ██████████received the

notice when he was the one being harassed.

63.   On or about ██████████ at 9 P.M., DCPD served ██████████

with the Temporary Anti-Stalking Order.  ██████████ cell phone was

inoperable during this police visit as well.  Since this was the second encounter

with the police, and no previous police report had been issued, ██████████

asked for and received confirmation that the note that had been left on the

neighbor's door was not threatening.

---

[4] The letter was dated ██████████ on day after ██████████ met with Defendants' agent, Jordan Weiss.
[5] The letter was served at 7 am by private courier.

64.    On or about ███████████ ███████████ left his home for fear of additional false accusations.  For added security, ███████████ did not go anywhere unless he had a trusted friend with him.

65.    On or about ███████████ DCPD knocked on ███████████ door, but ███████████ did not answer the door. Again, ███████████ cell phone was inoperable.

66.    ███████████ began making arrangements to be transferred to ███████████ after receiving the Notice to Correct Lease Violation. ███████████ made plans to leave the only career he had and the people he viewed as family because Defendants allowed TAHERZADA, ALI, ███████████ and others to take advantage of ███████████ post-traumatic stress symptoms.

67.    ███████████ moved to New York on or about ███████████

68.    On or about ███████████ the Anti-Stalking Order was dismissed.

69.    Contrary to the terms of the Lease, Defendants allowed TAHERZADA, ALI, ███████████ and others to threaten and disturb ███ ███████████ right to privacy, his safety, and his health. Defendants allowed TAHERZADA, ALI, ███████████ and others to tamper with telecommunications.

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT/WARRANTY OF HABITABILITY
(Against Defendants Tishman and Congressional)

70.    Plaintiff ███████████ reasserts and incorporates herein by reference the allegations contained in paragraphs 1-69 as if fully set forth

herein and further alleges:

71.    ▮▮▮▮▮▮▮▮▮and Defendants Tishman and Congressional entered into a valid Lease agreement for the term of ▮▮▮▮▮▮▮▮▮, until ▮▮▮▮▮ ▮▮ ▮▮▮

72.    ▮▮▮▮▮▮▮▮took possession of the unit identified in the Lease on or about ▮▮▮▮▮▮▮▮▮

73.    Without authorization from ▮▮▮▮▮▮▮▮ Defendants Tishman and Congressional allowed activity that unreasonably interfered with the permissible uses of the apartment.

i.    Defendants Tishman and Congressional leased to or allowed the use of multiple units by a group of people impersonating Homeland Security Investigators.

ii.    Defendants Tishman and Congressional, through their authorized agents, knew or should have known of that the behavior the impersonators intruded upon ▮▮▮▮▮▮▮▮▮ use of the apartment.

74.    The interference breached the warranty of habitability.

75.    ▮▮▮▮▮▮▮has suffered injuries in excess of $75,000.

76.    Therefore, Defendants Tishman, Congressional, and Allied are liable to ▮▮▮▮▮▮▮for damages in an amount to be proven at trial.

<u>COUNT TWO</u>
<u>NEGLIGENCE</u>
(Against All Defendants)

77.    Plaintiff ▮▮▮▮▮▮▮ reasserts and incorporates herein by reference the allegations contained in paragraphs 1-76 as if fully set forth

herein and further alleges:

78.    Defendants Tishman and Congressional had a duty to prevent known or foreseeable dangers.

79.    Defendants hired Allied to provide security for DC Crossing.

80.    Defendants Tishman, Congressional, and Allied knew or should have known that the impersonators were acting in a reckless manner, were purportedly conducting surveillance on residents of DC Crossing, had access to master codes/keys to allow entry into all apartments, had equipment that intercepted cell phones and other electronic devices, as well as behavior that violated the standard lease agreement.

81.    Defendants Tishman, Congressional, and Allied breached the duty to prevent known or foreseeable dangers.

82.    The breach of Defendants' duty was the actual and proximate cause of ████████ injuries, to include physical injuries sustained during a suicide attempt.

83.    ████████ has suffered injuries in excess of $75,000.

84.    Therefore, Defendants Tishman, Congressional, and Allied are liable to ████████ for damages in an amount to be proven at trial.

COUNT THREE
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Against All Defendants)

85.    Plaintiff ████████ reasserts and incorporates herein by reference the allegations contained in paragraphs 1-84 as if fully set forth herein and further alleges:

86.     Defendants Tishman, Congressional, and Allied acted negligently when

   i.     Defendants Tishman, Congressional, and Allied leased to or allowed the use of multiple units by a group of people impersonating Homeland Security Investigators.

   ii.     Defendants Tishman, Congressional, and Allied, through their authorized agents, knew or should have known of that the behavior the impersonators intruded upon ███████████ use of the apartment.

87.     Due to the negligence of Defendants Tishman, Congressional, and Allied, ████████ post-traumatic stress was exacerbated to the degree that ████████ contemplated suicide.

88.     Due to the negligence of Defendants Tishman, Congressional, and Allied, ████████ took a knife and made deep slashes to his thigh.

89.     Contemplation of suicide is serious emotional distress.

90.     Taking a knife to made deep lacerations into the thigh is serious emotional distress.

91.     As a result of Defendants' negligence, ████████ has suffered injuries and damages.

92.     ████████ has suffered injuries in excess of $75,000.

93.     Therefore, Defendants Tishman, Congressional, and Allied are liable to ████████ for damages in an amount to be proven at trial.

<u>COUNT FOUR</u>
<u>PRIVATE NUISANCE</u>
(Against All Defendants)

94.     Plaintiff ███████████ reasserts and incorporates herein by reference the allegations contained in paragraphs 1-93 as if fully set forth herein and further alleges:

95.     Defendants Tishman, Congressional, and Allied substantially and unreasonably interfered with Mr. deChauny's private use and enjoyment of his apartment.

96.     Defendants Tishman, Congressional, and Allied knew or should have known that they were substantially and unreasonably interfering with ███ ███████ private use and enjoyment of his apartment when

i.      Defendants Tishman, Congressional, and Allied leased to or allowed the use of multiple units by a group of people impersonating Homeland Security Investigators.

ii.     Defendants Tishman, Congressional, and Allied, through their authorized agents, knew or should have known of that the behavior the impersonators intruded upon ████████████ use of the apartment.

97.     Defendants Tishman, Congressional, and Allied, allowed a group impersonating Homeland Security Investigators to conduct surveillance in ███ ███████ apartment in the form of interference with his electronic devices.

98.     The substantial and unreasonable interference with ███. ███████ use and enjoyment of his apartment caused ████████████ injuries and damages.

99.     ████████████ has suffered injuries in excess of $75,000.

100.    Therefore, Defendants Tishman, Congressional, and Allied are liable to ████████████ for damages in an amount to be proven at trial.

## COUNT FIVE
## COMPUTER FRAUD AND ABUSE ACT
(Against All Defendants)

101.   Plaintiff ███████████ reasserts and incorporates herein by reference the allegations contained in paragraphs 1-100 as if fully set forth herein and further alleges:

102.   Defendants Tishman, Congressional, and Allied knew or should have known that the group of impersonators did not have authorization to intercept electronic equipment owned by ███████████

103.   Defendants Tishman, Congressional, and Allied knew or should have known that the group of impersonators were causing the transmission of a program, a command, information, or code that would cause damage to ███ ███████ electronic devices.

104.   Defendants Tishman, Congressional, and Allied knew or should have known that the group of impersonators intentionally caused the transmission.

105.   As a result of the transmission, ███████████ has suffered damages in excess of $5,000, having to replace an iPhone, a Mac Studio Computer, and a MacBook Pro.

106.   Therefore, Defendants Tishman, Congressional, and Allied are liable to ███████████ for damages in an amount to be proven at trial.

## COUNT SIX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against All Defendants)

107.   Plaintiff ███████████ reasserts and incorporates herein by

reference the allegations contained in paragraphs 1-106 as if fully set forth herein and further alleges:

108.   Defendants Tishman, Congressional, and Allied engaged in extreme and outrageous conduct.

109.   Defendants Tishman, Congressional, and Allied recklessly allowed a group of impersonators have access to the security devices put in place for the safety of the residents of DC Crossing.

110.   Allowing unauthorized access to private apartments, surveillance of residents, and interception of electronic devises, goes beyond what society would find acceptable from a landlord in a luxury apartment complex in the District of Columbia.  Especially one that touts the ethos of artful living, brimming with meaning, and designed for those who "understand that every step, every movement, every decision is part of an unfolding masterpiece."

111.   Because of Defendants' recklessness, ▆▆▆▆▆▆▆ has suffered bodily harm.

112.   Therefore, Defendants Tishman, Congressional, and Allied are liable to ▆▆▆▆▆▆ for damages in an amount to be proven at trial.

<u>COUNT SEVEN</u>
<u>CIVIL CONSPIRACY</u>
(Against All Defendants)

113.   Plaintiff ▆▆▆▆▆▆▆ reasserts and incorporates herein by reference the allegations contained in paragraphs 1-112 as if fully set forth herein and further alleges:

114.   Defendants Tishman, Congressional, and Allied entered an

agreement, either express or implied, that allowed impersonators to harm ████

████████.

115.    Defendants Tishman, Congressional, and Allied knew of the

harassment ███████████ was suffering at the hands of ███████ and chose

not to act.

116.    Defendants Tishman, Congressional, and Allied agreed to allow the

impersonators to continue the harassment.

117.    As a result of this conspiracy, ████████████has suffered injuries

in excess of $75,000.

118.    Therefore, Defendants Tishman, Congressional, and Allied are

liable to ██████████ for damages in an amount to be proven at trial.

## COUNT EIGHT
## RESPONDEAT SUPERIOR/VICARIOUS LIABILITY
(Against Tishman and Congressional)

119.    Plaintiff ███████████████ reasserts and incorporates herein by

reference the allegations contained in paragraphs 1-118 as if fully set forth

herein and further alleges:

120.    Defendants Tishman and Congressional hired Allied to provide

security to DC Crossings.

121.    Defendants Tishman and Congressional had control over the types

of services offered by Allied.

122.    Defendant Tishman and Congressional are liable for the acts and

omissions for the security services provided by Allied.

123.    Due to the acts and omissions of Allied by allowing a group of

impersonators to conduct surveillance and interfere with electronic and telecommunication devices.

124. As a result, ██████████ has suffered injuries in excess of $75,000.

125. Therefore, Defendants Tishman, Congressional, and Allied are liable to ██████████ for damages in an amount to be proven at trial.

COUNT NINE
INVASION OF PRIVACY
INTRUSION UPON SECLUSION
(Against All Defendants)

126. Plaintiff ██████████ reasserts and incorporates herein by reference the allegations contained in paragraphs 1-125 as if fully set forth herein and further alleges:

127. Defendants Tishman, Congressional, and Allied allowed a group of impersonators to intrude upon ██████████ apartment and electronic and telecommunication devices.

128. ██████████ electronic and telecommunication devices were private.

129. ██████████ electronic and telecommunication devices contained private concerns.

130. The impersonators used the sense of hearing to surveil ████ ██████████ and learned information that was not common knowledge.

131. Surreptitiously and without authorization, the impersonators invaded ██████████ private spaces, causing ██████████ significant distress.

132.   As a result, ████████ has suffered injuries in excess of $75,000.

133.   Therefore, Defendants Tishman, Congressional, and Allied are liable to ████████ for damages in an amount to be proven at trial.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order and judgment providing the following relief:

1. Punitive and Compensatory Damages in excess of $75,000, in an amount to be proven at trial;

2. Prejudgment and post-judgment interest;

3. Plaintiffs' costs and attorney's fees; and

4. Such other and further relief as this Court deems just or proper, or that justice may require.

Respectfully submitted on this June 3, 2022, by

WILT & KRAFT, PLLC
Counsel for Plaintiff

*Theresa Kraft / s/*

**Theresa Kraft, Esq.**
D.C. Bar No. 1741565
**Wilt & Kraft, PLLC**
1629 K Street NW, Suite 300
Washington, DC 20006
202-508-3648 (office)
603-568-2464 (cell)
**TKraft@WiltandKraft.com**